**JOHNSON BUILDING
COMPANY, Plaintiff,**

**Coon Rapids Properties, Appellant,**

v.

**RIVER BLUFF DEVELOPMENT
COMPANY, et al., Respondents,**

**Alan Smith, et al., Defendants.**

**No. C4–84–1919.**

Court of Appeals of Minnesota.

Sept. 10, 1985.

Review Denied Nov. 18, 1985.

Phillip J. Martini, Minneapolis, for appellant.

Jerrold M. Hartke, South St. Paul, for respondents.

Considered and decided by RANDALL, P.J., and SEDGWICK and HUSPENI, JJ., with oral argument waived.

## OPINION

HUSPENI, Judge.

Coon Rapids Properties (CRP) and Johnson Building Company (JBC) brought this action against River Bluff Development Company (River Bluff) for specific performance of a real estate purchase agreement. River Bluff counterclaimed against CRP and JBC and alleged that, among other things, CRP and JBC made fraudulent misrepresentations to River Bluff. The trial court determined that the purchase agreement was void as a result of fraud in its inception or, in the alternative, that the requirements of the purchase agreement were not complied with, and consequently, CRP is not entitled to specific performance. River Bluff was awarded judgment against CRP for $71,209.84. CRP's motion for amended findings was denied and CRP appeals. We affirm the trial court as modified.

## FACTS

This case involves a proposed development of the Crown Roller Mill (Crown Mill)

property which is located in the old milling district near St. Anthony Falls in Minneapolis.

River Bluff is a general partnership and the vendee in a contract for deed for the purchase of the Crown Mill property. The partners in River Bluff are Charles D. Gross, Sr., Charles J. Gross, Jr., Glen Olson and Alan Smith. In late 1982, River Bluff began discussing a potential co-development of the Crown Mill property with CRP. CRP is a general partnership consisting of Viking Investment Company, Inc. (Viking) and Proplan Properties, Ltd. Bruce Burton is one of the three shareholders in Viking and he represented CRP both as a shareholder and as CRP's attorney during all the dealings with River Bluff.

On January 10, 1983, River Bluff and CRP entered into a development agreement providing for the formation of a new partnership between River Bluff and CRP which would develop the Crown Mill property. Subsequently, River Bluff and CRP disagreed on certain aspects of the project. In particular, the River Bluff partners disagreed with CRP's proposed changes in the development plan which River Bluff had already formulated.

As a result of these disagreements, River Bluff and CRP changed their agreement to a purchase agreement whereby CRP would purchase the Crown Mill property from River Bluff. River Bluff was to retain equity in the project as a limited partner in the partnership that was to be formed between CRP and River Bluff. This revised agreement was intended to protect River Bluff's substantial investment in the Crown Mill property while giving CRP more latitude to follow its own ideas about the project.

Throughout the parties' negotiations both CRP and River Bluff discussed other potential investors. River Bluff saw a need for a strong "balance sheet partner" —a partner who had a substantial net worth which could cover any operating deficits that the project incurred.

Representatives of River Bluff testified that Burton represented to them that Williams Steel and Hardware Company (WSH) was interested in being a general partner in the proposed partnership. WSH is a wholesaler of steel and industrial supplies and it also has subsidiaries which deal in real estate development. It is undisputed that WSH would have been a strong "balance sheet partner." Burton testified that he indicated to River Bluff representatives that WSH was a potential investor, but he did not tell them that WSH was a potential general partner. The president of WSH's real estate development subsidiaries testified that he had some preliminary discussions with the persons involved in developing the Crown Mill property, but WSH never reached any decision or made any commitment regarding its participation in the project.

Before a purchase agreement was executed between CRP and River Bluff, JBC became interested in the Crown Mill project. Robert Johnson was the president and principal owner of JBC. JBC is primarily a general contractor; occasionally, it is a construction manager for a project. CRP and JBC wanted JBC to be involved in the Crown Mill project both as the general contractor and as a general partner. River Bluff opposed JBC's dual participation in the project. River Bluff was concerned that the dual roles of a general contractor and general partner would create a conflict, since the general contractor could funnel potential profits to itself as construction costs and decrease the partnership's profits. River Bluff was also concerned that, with a general contractor as a general partner, the project would not be subject to bids from other companies, and thus, the project costs would be higher and River Bluff's profit share lower. River Bluff was further concerned that JBC did not have the financial capability to be a general partner in the project.

Between February 22–24, 1983, CRP and River Bluff met several times to negotiate and review the purchase agreement. River Bluff was represented by legal counsel throughout these negotiations and all of River Bluff's other dealings with CRP.

The final purchase agreement provided that River Bluff would transfer the Crown Mill property to CRP and, in return, River Bluff would receive $750,000 and an interest in a partnership or corporation whereby River Bluff would receive twenty percent of the profits from the project and a ten percent interest in the losses.

The purchase agreement provided a typical assignment clause as follows:

Purchaser may assign its rights, duties and obligations under this Purchase Agreement without the consent of Seller, before or after the closing.

With respect to the assignment clause, Gross, Jr. and Charles Nixon, River Bluff's attorney, testified that Burton represented that the only purpose of the assignment clause was so that the property could be transferred to the partnership that was to be formed between CRP and River Bluff. Burton denied making this statement.

The purchase agreement also included the following clause:

This written Purchase Agreement constitutes the entire and complete agreement between the parties hereto and supersedes any prior oral or written agreements between the parties hereto with respect to the [Crown Mill property] including that certain Agreement dated January 10.

One of the drafts of the purchase agreement identified JBC as a general partner and purchaser of the property. Smith and Gross, Jr. testified that they told Burton that they did not want JBC involved in the purchase agreement and, therefore, Burton deleted JBC from the agreement. Burton and Johnson testified that JBC was deleted from the purchase agreement because Johnson could not be present to sign the agreement and JBC's participation in the purchase agreement was not crucial to the project since the purchase agreement was only between River Bluff and CRP.

On February 22, 1983, Burton, on behalf of CRP, sent a letter of intent to Roger Johnson which proposed that CRP and JBC would serve as general partners of a limited partnership which would develop the Crown Mill property and Johnson would be the managing general partner of all the construction. The letter of intent also provided that CRP would transfer its rights to the Crown Mill property to the newly-formed partnership. Johnson, on behalf of JBC, signed the letter of intent on February 24, 1983. River Bluff did not know about the development agreement between CRP and JBC until this litigation began.

On February 26, 1983, representatives of River Bluff, CRP and JBC met to discuss the project. At that meeting, JBC's involvement in the project was discussed. Minutes of the meeting prepared by JBC state, among other things, that "[o]verall project coordination will be the responsibility of Johnson Building Company." There is conflicting testimony whether JBC was identified at that meeting as the general contractor. Smith testified that he understood that JBC was the construction manager, not the general contractor. Along with the minutes from this meeting, River Bluff received a copy of a list of participants in the Crown Mill project. The list identified JBC as a general partner.

The February 24 purchase agreement provided that CRP would pay the holding costs of the Crown Mill property through the date of closing. On March 18, 1983, River Bluff accepted a $3,027.23 check from JBC for holding costs. On April 8, 1983, River Bluff sent CRP notice of its intention to cancel the purchase agreement if certain defaults on holding costs were not cured within thirty days. This notice was without legal effect because it failed to comply with Minn.Stat. § 559.21 (1982) (statutory requirements for terminating a contract of sale of real estate). On May 2, 1983, JBC tendered to River Bluff a check for $9,560.18, an amount sufficient to cure the defaults. River Bluff rejected this check.

On April 25, 1983, CRP and JBC entered into a purchase agreement whereby CRP was to sell the Crown Mill property to JBC for $781,000. On April 26, 1983, Viking (one of the partners of CRP) and JBC entered into a partnership agreement for the

development of the Crown Mill property. River Bluff was not included in this partnership agreement and it was not aware of the purchase agreement until it received a letter dated May 11, 1983 from Burton. On that same day, River Bluff sent CRP another letter purporting to cancel the February 24 purchase agreement on the grounds that the defaults under the purchase agreement had not been cured.

On May 25, 1983, CRP sought a preliminary injunction against River Bluff, which would enjoin it from cancelling the purchase agreement. The preliminary injunction was denied on the basis that CRP had an adequate legal remedy for River Bluff's purported breach (the difference between what CRP paid to River Bluff and what JBC paid to it in April 1983).

On July 1, 1983, the date of closing specified in the February 24 purchase agreement, CRP and River Bluff met and CRP demanded to close on the property. At the closing, CRP presented River Bluff with a letter from JBC's bank which stated that the bank would certify sufficient funds to meet the closing terms of the purchase agreement. CRP also presented River Bluff with a limited partnership agreement which it contends complied with the terms of the February 24 purchase agreement. River Bluff refused to follow through with the closing because it claimed that JBC's letter from the bank and the proposed limited partnership agreement were both inadequate under the terms of the February 24 agreement. River Bluff contends that the proposed limited partnership agreement substantially reduced its equitable interest in the project.

On July 12, 1983, River Bluff sent CRP a second notice of cancellation of the February 24 purchase agreement. This attempted cancellation was prevented by a restraining order issued on August 3, 1983. The restraining order remained in force until the judgment in this case was entered.

CRP and JBC initiated this action against River Bluff for specific performance of the February 24 purchase agreement and for damages arising from River Bluff's breach of the agreement. River Bluff asserted in defense that it was fraudulently induced into executing the February 24 agreement.

Following a lengthy trial to the court, the court determined that prior to River Bluff's execution of the purchase agreement, CRP represented to River Bluff that:

(1) the assignment clause would only be used to assign the Crown Mill property to the partnership which was to be created between CRP and River Bluff;

(2) JBC would not be a general partner in the proposed partnership;

(3) WSH wanted the purchase agreement signed and delivered to it on February 24, 1983 so that it could decide what role JBC would have in the project;

(4) CRP would prepare a partnership agreement between CRP and River Bluff in conformance with the purchase agreement and present it to River Bluff by Friday, March 4, 1983.

The trial court further determined that River Bluff relied upon CRP's representations when it entered into the purchase agreement, that those representations were material ones and CRP knew that representations (1)–(3) were false and those representations were of past and present facts. The trial court also determined that CRP never prepared a partnership agreement in conformance with the purchase agreement.

The trial court concluded that the February 24 purchase agreement is void as a result of fraud in its inception and that River Bluff did not waive that fraud. In the alternative, the trial court determined that the partnership agreement proposed to River Bluff at the July 1, 1983 closing was vague and indefinite as to River Bluff's interest in the partnership and, hence, the partnership agreement did not comply with the requirements of the February 24 purchase agreement. Accordingly, the court concluded that CRP is not entitled to specific performance since it did not substantially comply with the terms of the purchase agreement.

The trial court awarded River Bluff judgment against CRP in the amount of $71,-

209.84. These damages included amounts for Smith's and Gross, Jr.'s services, interest on liens and judgments, security costs, and insurance costs. The damages award excluded River Bluff's attorney's fees. The trial court also determined that JBC is entitled to the return of the funds it paid as earnest money, holding costs and payments on River Bluff's contract for deed, since those payments now inure to River Bluff's benefit. The court also ordered River Bluff to return the uncashed check of $9,560.18 to JBC.

## ISSUES

1. Did the trial court improperly admit parol evidence?

2. Did the trial court err in determining that appellant made fraudulent representations to respondent?

3. Did the trial court err in determining that respondent did not ratify appellant's fraud?

4. Did the trial court err in its award of damages?

## ANALYSIS

### I.

CRP argues that the trial court erred in admitting evidence regarding the parties' negotiations prior to and contemporaneous with the February 24 purchase agreement.

■■■ The parol evidence rule excludes evidence outside a written document which varies or contradicts the plain terms of the document. *Hield v. Thyberg,* 347 N.W.2d 503, 507 (Minn.1984). This rule is tempered by a number of exceptions. *Id.* One well-recognized exception is when a contract is attacked on grounds of fraud. The parol evidence rule is inapplicable to exclude evidence of fraudulent oral representations by one party which induce another to enter into a written contract. *Hanson v. Stoerzinger,* 299 N.W.2d 401, 404 n. 4 (Minn. 1980); *Martin v. Guarantee Reserve Life Insurance Co.,* 279 Minn. 129, 136, 155 N.W.2d 744, 748 (1968) (citing *Hafner v. Ritzinger,* 256 Minn. 196, 199, 97 N.W.2d

839, 842 (1959)). *See also* 3 A. Corbin, Contracts § 580 (1960). Evidence of fraudulent representations is not admitted to vary the terms of a contract but to establish that, because of such fraudulent representations, no enforceable contract was made. If such evidence was excluded, a party to a contract could seldom, if ever, succeed on a claim of fraud.

■■■ The fact that the purchase agreement contained a "full integration" clause does not alter our conclusion that the trial court properly admitted parol evidence. A "full integration" clause does not prevent proof of fraudulent representations by a party to the contract. 3 A. Corbin, Contracts § 578, at 405 (1960).

River Bluff claimed that it was induced to execute the purchase agreement through CRP's fraudulent misrepresentations about JBC's and WSH's. role in the project and the limited purpose of the assignment clause. The parol evidence rule presented no bar to proof of these claims.

### II.

CRP contends that the trial court's determination of fraud was erroneous for several reasons.

The elements of fraudulent misrepresentation are set forth in *Weise v. Red Owl Stores, Inc.,* 286 Minn. 199, 175 N.W.2d 184 (1970):

(1) There must be a representation.

(2) That representation must be false.

(3) It must have to do with a past or present fact.

(4) That fact must be material.

(5) It must be susceptible of knowledge.

(6) The representer must know it to be false or, in the alternative, must assert it as of his own knowledge without knowing whether it is true or false.

(7) The representer must intend to have the other person induced to act or justified in acting upon it.

(8) That person must be so induced to act or so justified in acting.

(9) That person's action must be in reliance upon the representation.

(10) That person must suffer damage.
(11) That damage must be attributable to the misrepresentation, that is, the statement must be the proximate cause of the injury.

*Id.* at 202–03, 175 N.W.2d at 187.

■ It is within the province of the trier of fact to determine whether a party has misrepresented material facts and whether the misrepresentations proximately caused the other party's injury. *Barr/Nelson, Inc. v. Tonto's, Inc.*, 336 N.W.2d 46, 51 (Minn.1983). On appeal, findings made by the trial court will not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. Minn.R.Civ.P. 52.01; *Strouth v. Wilkison*, 302 Minn. 297, 299, 224 N.W.2d 511, 513–14 (1974). Where there is a conflict of evidence, it is for the trial court hearing a matter without a jury to sift the evidence and determine the facts, and we will not disturb its findings where there is evidence which reasonably supports them. *Peterson v. Johnston*, 254 N.W.2d 360, 362 (Minn.1977). Viewed as a whole, the evidence reasonably supports the court's finding of fraud.

### A. Past and Present Facts

■ CRP contends that its alleged representations did not deal with past or present facts. We disagree. A misrepresentation of a present intention can amount to fraud when the repres

enter had no intention of following through on his representation at the time the representation was made. *Vandeputte v. Soderholm*, 298 Minn. 505, 508, 216 N.W.2d 144, 147 (1974).

■ There is evidence that when the purchase agreement was executed, Burton, as a representative of CRP, knew that his representations were false and that they would never materialize. His representations were not of expectations as to future acts or events. There is evidence that Burton anticipated an assignment of the property, when he told representatives of River Bluff that the assignment clause would only operate to assign the property to the proposed partnership. He had already executed a letter of intent to enter into a partnership with JBC. There was also evidence that he, in fact, intended JBC to be a general partner in the project even though he represented JBC's role in the project otherwise. There was further evidence that Burton's representation regarding WSH's role was untrue at the time of the execution of the purchase agreement. This evidence satisfied the element of fraud which requires representations of past or present facts.

### B. Justifiable Reliance

■ CRP also claims that there was no evidence to support the court's finding that River Bluff relied on Burton's representations and that, if there was any reliance on the misrepresentations, it was not reasonable or justifiable. Where there is an inconsistency between oral promises and the written terms of an agreement, the issue is whether there could be reasonable reliance on the promise. *General Corporation v. General Motors Corporation*, 184 F.Supp. 231, 238 (D.C.Minn.1960). We could find that reliance on an oral representation was unjustifiable as a matter of law only if the written contract provision explicitly stated a fact completely contradictory to the claimed misrepresentation. *Clements Auto Co. v. Service Bureau Corporation*, 444 F.2d 169, 179 (8th Cir.1971) (citing *Vint v. Nelson*, 267 Minn. 490, 127 N.W.2d 177 (1964) ). When a promise is not in plain contradiction of a contract or, if contradictory, when it is accompanied by misrepresentations of other material facts in addition to the contradictory intent, the question of reasonable reliance is for the trier of fact. *General Corporation*, 184 F.Supp. at 239.

■ In this case, the question of reasonable reliance was for the trial court. Burton's representations regarding the assignment clause did directly contradict the contract, but it was accompanied by misrepresentations regarding JBC's and WSH's role in the project as well as mis-

leading representations regarding when the River Bluff/CRP partnership would be formed. We may have viewed the evidence on the reliance issue differently than the trial court, particularly in light of the fact that River Bluff was represented by legal counsel throughout its dealings with CRP. We cannot conclude, however, that the court's finding of reasonable reliance is clearly erroneous. *See Tonka Tours, Inc. v. Chadima*, 372 N.W.2d 723 (Minn.1985) (citing *State v. Simonsen*, 252 Minn. 315, 324, 89 N.W.2d 910, 916 (1958)) (trial court's findings on disputed questions of fact will not be upset merely because a reviewing court may view the evidence differently).

### III.

CRP also contends that the trial court erred in determining that River Bluff did not ratify the alleged fraud. CRP asserts that River Bluff knew of the alleged fraud and continued to derive benefits pursuant to the terms of the agreement.

■ A party who may avoid a contract for fraud ratifies it by accepting and retaining the benefits of it. *Proulx v. Hirsch Brothers, Inc.*, 279 Minn. 157, 163, 155 N.W.2d 907, 912 (1968). To establish a waiver or ratification of fraud, there must be evidence that the waiving party had full knowledge of the facts and his legal rights, and intended to relinquish these rights. *Freitag v. Wolf*, 303 Minn. 139, 142, 226 N.W.2d 868, 870 (1975).

■ While the evidence is conflicting, there is sufficient evidence to support the court's finding that River Bluff did not ratify the fraud. River Bluff's cooperation with JBC until April 1983 does not necessarily indicate that River Bluff ratified the alleged fraud. The record is replete with evidence that River Bluff did not know JBC's true role in the project until at least sometime in April, if not May 1983. The only evidence which would indicate otherwise is the list that identified JBC as a general partner which accompanied the minutes of the February 26 meeting. Based on CRP's representations, the part-

ners of River Bluff could still reasonably have thought that JBC was a construction manager, rather than a general partner or general contractor. As soon as River Bluff was aware of JBC's actual role in the project, it refused to accept any more funds from JBC. We cannot say that the court's conclusion that River Bluff did not ratify CRP's fraud is clearly erroneous.

Since we affirm the court's determination of fraud, we do not address CRP's arguments which relate to the trial court's alternative holding.

### IV.

Both CRP and River Bluff challenge the trial court's damages award.

■ The "out-of-pocket" damages rule is the rule of recovery for fraud in Minnesota. *Lewis v. Citizens Agency of Madelia, Inc.*, 306 Minn. 194, 199, 235 N.W.2d 831, 835 (1975). The out-of-pocket rule allows recovery of those damages which are the natural and proximate loss sustained by a party because of reliance on misrepresentations. *Id.* at 200, 235 N.W.2d at 835. The issue is not what the injured party might have gained through the transaction but what was lost by reason of the other party's misrepresentations. *Id.* The loss is usually measured as the difference between what the injured party parted with and what he received, together with other damages that were proximately caused by the fraud. *Strouth*, 302 Minn. at 300, 224 N.W.2d at 514. The amount of damages is to be determined by the finder of fact. *Id.*

The trial court awarded River Bluff damages as follows:

| | |
|---|---|
| Services of Charles Gross, Jr. | $28,200.00 |
| Services of Alan Smith | 26,800.00 |
| Interest on liens & judgments | 6,339.84 |
| Security costs | 5,500.00 |
| Insurance costs | 4,370.00 |
| | $71,209.84 |

■ CRP argues that none of these costs are attributable to its fraudulent misrepresentations. The amounts compensating River Bluff for the services of Gross,

Jr. and Smith covered the costs of the time they spent facilitating the purchase agreement and the project, and correcting the harm that they felt CRP's and JBC's short-term involvement in the project caused. This damages amount also included the value of the time spent away from their regular duties as a result of CRP's misrepresentations. These costs were causally related to CRP's misrepresentations. The trial court properly allowed River Bluff's damages claim for these amounts.

The interest on liens and judgments is also recoverable. The purchase agreement provided that CRP would pay certain liens and judgments on the Crown Mill property. It did not pay those costs and, as a result, River Bluff has incurred interest charges. The trial court properly awarded River Bluff these interest expenses as damages.

■ We do not find that River Bluff's security and insurance costs are recoverable. It is unclear from the record what causal link the trial court found between the security and insurance costs and CRP's misrepresentations. River Bluff argues that these holding costs were caused by CRP's misrepresentations because, if the agreement had gone forward as planned, the project would have been under construction and the holding costs would have been prevented. This assertion is speculative given the uncertainty of the project's financing. It appears that River Bluff would have incurred the holding costs absent CRP's misrepresentations. Accordingly, we find that the trial court erred in awarding River Bluff security and insurance costs amounting to $9,870.

■ River Bluff asserts that the out-of-pocket rule is not applicable in this case and it is entitled to additional damages representing costs incurred as a result of a fire which extensively damaged the Crown Mill property on October 21, 1983. Minnesota recognizes a narrow exception to the out-of-pocket damages rule and permits recovery for consequential economic damages under circumstances where the recovery of out-of-pocket damages would not return the injured party to the position it was in but for the misrepresentation. *Lewis*, 306 Minn. at 200, 235 N.W.2d at 835. We do not find the exception applicable. Assessing River Bluff's damages under the out-of-pocket rule effectively operates to place River Bluff in the position that it was in but for CRP's misrepresentations.

■ River Bluff also asserts that it is entitled to attorney's fees. We disagree. Attorney's fees are not generally recoverable damages absent specific contractual or statutory authorization. *Hill v. Okay Construction Co.*, 312 Minn. 324, 347, 252 N.W.2d 107, 121 (1977). We find no authority for an award of attorney's fees in this case. The trial court properly denied River Bluff's claim of attorney's fees.[1]

## DECISION

The trial court properly admitted parol evidence. The trial court did not err in determining that CRP made fraudulent representations to River Bluff and that River Bluff did not ratify the fraud. The trial court's damages award is proper except for its award of $9,870 for security and insurance costs. Accordingly, we reverse the trial court on this limited ground and order the trial court to enter judgment against CRP in favor of River Bluff in the amount of $61,339.84.

Affirmed as modified.

---

**1.** River Bluff also asserts that CRP should be dismissed from this action on the grounds that it is not a real party in interest. Our review of the record reveals that this issue was not raised or addressed in the trial court, and consequently, this court will not consider it. *Benedict v. Benedict*, 361 N.W.2d 429, 431–32 (1985).