**GOPHER OIL COMPANY, INC., a Minnesota corporation, Plaintiff,**

v.

**UNION OIL COMPANY OF CALIFORNIA, a California corporation, Defendant.**

Civ. No. 4–88–16.

United States District Court,
D. Minnesota,
Fourth Division.

Oct. 12, 1990.

Judgment Vacated Nov. 23, 1990.

Judgment Order Nov. 20, 1990.

See also 757 F.Supp. 998.

of the trial the jury returned a Special Verdict which read:

We, the jury in the above entitled action, return the following answers to the questions of fact presented to us.

## PART I—MISREPRESENTATION

1. Before plaintiff Gopher Oil purchased the site, did defendant Union Oil misrepresent material facts to Gopher Oil about the condition of the site?

Yes

If your answer to Question No. 1 is "Yes," answer Question No. 2. If your answer to Question No. 1 is "No," do *not* answer any of the remaining questions in part I; rather proceed directly to question No. 8.

2. Did plaintiff Gopher Oil know, or by the exercise of reasonable care should it have known, before January 11, 1982, that defendant Union Oil misrepresented facts about the condition of the site?

No

If your answer to Question No. 2 is "No," answer Question No. 3. If your answer to Question No. 2 is "Yes," do *not* answer any of the remaining questions in part I, rather, proceed directly to question No. 8.

3. When defendant Union Oil misrepresented facts to plaintiff Gopher Oil, did Union Oil know those facts were false or assert those facts without knowing whether they were true or false?

Yes

If your answer to Question No. 3 is "Yes," answer Question No. 4. If your answer to Question No. 3 is "No," do *not* answer any of the remaining questions in part I; rather, proceed directly to question No. 8.

4. Did plaintiff Gopher Oil rely on defendant Union Oil's misrepresentation about the condition of the site?

Lawrence C. Brown, Delmar R. Ehrich, Brian Boru O'Neill, Paul M. Vaaler, Faegre & Benson, Minneapolis, Minn., for plaintiff.

Joe A. Walters, Corey John Ayling, O'Connor & Hannan, Minneapolis, Minn., for defendant.

### ORDER

Filed Oct. 12, 1990.

DOTY, District Judge.

This matter came on for trial before a jury on June 25, 1990, and was tried through July 11, 1990. At the conclusion

Yes

If your answer to Question No. 4 is "Yes," answer Question No. 5. If your answer to Question No. 4 is "No," do *not* answer any of the remaining questions in part I; rather, proceed directly to question No. 8.

5. Did defendant Union Oil make the misrepresentation about the condition of the site (1) with the intent to induce plaintiff Gopher Oil to act in reliance upon it, or (2) was plaintiff Gopher Oil justified in relying on defendant Union Oil's misrepresentation about the condition of the site? If you find either (1) or (2) is true, your answer to Question No. 5 is "Yes," if you find neither (1) nor (2) is true, your answer to Question No. 5 is "No."

Yes

If your answer to Question No. 5 is "Yes," answer Question No. 6. If your answer to Question No. 5 is "No," do *not* answer any of the remaining questions in part I; rather, proceed directly to question No. 8.

6. Did defendant Union Oil's misrepresentations about the condition of the site directly cause plaintiff Gopher Oil to suffer damages:

Yes

If your answer to Question No. 6 is "Yes," answer Question No. 7. If your answer to Question No. 6 is "No," do *not* answer any of the remaining questions in part I; rather, proceed directly to question No. 8.

7. What amount of money will fairly compensate plaintiff Gopher Oil for the damages it suffered as a direct result of defendant Union Oil's misrepresentation regarding the condition of the site?

$1,823,272.81

PART II—CLEAN–UP
RESPONSIBILITY

8. As part of its purchase of the Thornton Avenue site in 1980, did Gopher Oil Company agree to assume the risk of environmental clean-up obligations and to hold W.H. Barber (Union Oil) Company harmless for the cost of any such clean-up?

No

Please answer Question No. 9.

9. Taking all of the responsibility for response costs to be incurred in the future to be 100%, what percentage of responsibility for those response costs do you attribute to:

> 0% Gopher Oil
> 100% Union Oil
> 0% Barber Oil
> ———
> 100%

After the jury returned the verdict both parties submitted proposed Findings of Fact and Conclusions of Law and defendant submitted motions for summary judgment and a new trial.

## I. CERCLA AND MERLA

### A. FINDINGS OF FACT

For Gopher Oil's CERCLA and MERLA claims, the court makes the following findings of fact:

### 1. *The Site*

Gopher Oil Company, Inc. ("Gopher Oil") is the owner of a five acre site located at 825 Thornton Avenue Southeast, Minneapolis, Minnesota ("site"). The site is extensively contaminated with oil and industrial chemicals.

From the early 1900's to 1980, W.H. Barber Company ("W.H. Barber") and its predecessors owned and operated a bulk oil and chemical facility located at the site. It included a dock for loading and unloading tanker trucks and railroad tank cars carrying petroleum products, chiefly lubricants such as motor oils and hydraulic fluids, and industrial chemicals. It also had stationary "tank farms" located throughout the site for storage of those products. W.H. Barber blended oil and chemicals into finished products and repackaged them into small containers ranging from 55–gallon barrels to one-quart cans at the site. In 1955, Pure

Oil Company acquired W.H. Barber which became a wholly-owned subsidiary of Pure Oil Company. In 1965, Pure Oil Company merged with the Union Oil Company of California ("Union Oil"). In connection with the merger, W.H. Barber became a wholly-owned subsidiary of Union Oil.

### 2. *Union Oil's W.H. Barber Operation*

Union Oil operated the W.H. Barber operation as part of its Eastern Marketing Region of the Union 76 Division. W.H. Barber was part of a larger department known as "Subsidiary Sales." This department comprised six organizations that operated in markets other than retail or commercial sales of Union 76 products. Union Oil management did not treat the W.H. Barber "subsidiary" any differently from the other organizations in the same department.

Union Oil management exercised control over W.H. Barber's operations. Union Oil retained title over products it sent to W.H. Barber. It required W.H. Barber to blend and package products to Union Oil specifications. Union Oil also controlled sales of W.H. Barber's finished products. At times, Union Oil ordered W.H. Barber to stop selling certain oil products so that those sales could be transferred to another Union Oil operation in St. Paul, Minnesota. Union Oil also unilaterally reassigned W.H. Barber personnel to the Union Oil operation in St. Paul.

Union Oil hired, fired and promoted W.H. Barber personnel, sometimes against the wishes of W.H. Barber management. Union Oil set pay grades and job classifications consistent with Union Oil policy. Personnel at the W.H. Barber facility were paid by Union Oil rather than W.H. Barber. Union Oil also approved employee terminations.

Union Oil required W.H. Barber to package Union 76 brand lubricants on a break-even cost basis. Union Oil paid W.H. Barber a packaging fee. Union Oil determined the fee by reference to per-unit costs plus freight charges for comparable packaging at Union Oil's Cincinnati, Ohio, packaging facility.

Union Oil monitored environmental safety and compliance at all Union Oil facilities, including W.H. Barber. No distinctions were made between W.H. Barber and other operations directly owned and operated by Union Oil. W.H. Barber was required to report any environmental concerns to Union Oil.

Union Oil also required W.H. Barber to report any potential environmental violations. This requirement covered spills and leaks of chemicals or oil at the facility.

Union Oil assisted W.H. Barber in complying with environmental regulations and standards. Union Oil prepared a Spill Prevention Countermeasures and Control Plan for the site as required under the Federal Clean Water Act. The Plan lists Union Oil, not W.H. Barber, as the owner of the site.

The general managers of W.H. Barber from 1965 to 1980, made no significant business decisions without approval from a Union Oil manager of subsidiary sales in Schaumberg, Illinois. Final decisions rested with a Union Oil sales manager in Schaumberg rather than the head of W.H. Barber's operations in Minneapolis. Former workers at the site considered themselves employees of Union Oil.

### 3. *Union Oil's AMSCO Operation*

The site included an operation of the American Mineral Spirits Company ("AMSCO"), which was a directly owned and operated division of Union Oil. AMSCO stored, blended and packaged industrial chemicals into 55–gallon drums and smaller containers. The AMSCO operation spanned the period from 1965 to 1980. Union Oil's AMSCO division maintained an office on the site as well as a sales manager, and sales marketing, accounting and operations personnel.

W.H. Barber and AMSCO shared the facilities at the site, although use of one facility for blending and repackaging industrial chemicals belonged almost exclusively to AMSCO. This facility was known as the "gas house." As a matter of operating convenience, employees who worked on AMSCO products in the "gas house" tech-

992

nically remained W.H. Barber employees but did only AMSCO work and were supervised by AMSCO managers. That arrangement was in place before and after the merger between Pure Oil Company and Union Oil in 1965.

Certain storage tanks at one of the facility's "tank farms" were also set aside for AMSCO chemical products. Significantly, AMSCO retained title to the products stored at the "chemical tank farm" set aside for AMSCO products. Union Oil also retained title to products sent to the W.H. Barber operation for processing.

AMSCO paid for its use of the facility through a packaging fee charged on its products. AMSCO also paid the employees it used, as well as a percentage of the facility overhead such as utilities, taxes and other expenses. AMSCO also paid for handling losses of its products due to flushing of pipes, transfer lines, or drainage of tanks. AMSCO was also responsible for its own repairs, maintenance and capital expenditures.

AMSCO was responsible for environmental compliance of its operation at the site. AMSCO, known as the Union Chemicals Division, submitted an application for a hazardous waste generator's license to the Hennepin County Department of Environment and Energy for this site. It also submitted a notification of hazardous waste activities to the United States Environmental Protection Agency ("USEPA"). On both forms, Union Chemicals Division, not W.H. Barber, was listed as owner of the facility.

### 4. Site Contamination from Union Oil's Operations

The W.H. Barber and AMSCO operations, which Union Oil controlled and operated from 1965 to 1980, were the cause of innumerable leaks, spills and incidents of intentional dumping involving oil and industrial chemicals.

Leaking valves, fittings, pipes and tanks were common to both operations at the site. Oil and industrial chemicals were released throughout the site. Leaks and spills were attributable to the age of the facilities and to poor maintenance. Proposed capital improvements to update the site facilities in the 1970's were not implemented when Union Oil decided to sell it.

Oil and industrial chemicals leaked, spilled and intentionally dumped at and around the site during these operations included, but were not limited to motor oil and lubricating oil; petroleum hydrocarbons, such as benzene, toluene and xylene; solvents such as trichlorethylene, dicloroethane, and methyisobutyl ketone; and pesticide compounds such as DDD, DDE and DDT.

Pesticides containing DDT were blended and packaged at the site. As part of the pesticide blending process, bags of pure DDT flake were poured into an outdoor vat at the site. Wind blew DDT flakes throughout the site and into neighboring properties. The site is located next to a residential neighborhood in southeast Minneapolis, Minnesota. Trees surrounding the site were defoliated and the soil at the site contains DDT.

Barrels used to store oil and industrial chemicals for W.H. Barber and AMSCO were also a source of contamination. Until the mid–1970's, partially full barrels were accepted from customers for reconditioning. When returned, the barrels were emptied of their contents in a "drum yard" located north of the main office building at the site.

The barrel reconditioning process also contaminated the site. Alcohol and solvents were added to the insides of the barrels and later sucked out via a pump into two holding tanks. These holding tanks were periodically emptied into a tank truck and used to spray the barrel yard for dust control.

The "gas house" where AMSCO operated was also a source of contamination. A hose connected to the gas house used to load and unload tank trucks and had a capacity of 10 to 15 gallons. After transferring industrial chemicals, the residual 10 to 15 gallons in the hose would be flushed out onto the ground or flushed in five-gallon buckets. The buckets were then taken

to the chemical tank farm north of the gas house and dumped. This was routine practice in transferring chemicals for blending and packaging that ended sometime in the mid–1970's.

Storage tankers were periodically overfilled with oil and industrial chemicals, which would run down the sides and onto the ground. The bottoms of storage tanks, particularly those at the chemical tank farm, corroded and leaked. In the 1970's Union Oil rejected proposals to update and replace storage tanks. It was standard procedure for Union Oil that, whenever storage tanks were cleaned and removed, tank bottoms and sludge from the bottom of the tanks was then dumped into pits dug at the tank farms on site. The pits were then covered with dirt and grass to make the ground look "natural."

There were also numerous spills of oil and industrial chemicals on the siding of railroad tracks at the facility. During unloading operations there was also product leaking on the ground, especially when valves underneath the railroad tank cars were opened. In 1977 gum turpentine was spilled throughout the site due to a railroad tank car with an open valve. Much of the gum turpentine went into the soil and was never recovered.

Periodically, sand and cinders were spread on the rail siding to act as a "blotter" to soak up some of the oil and chemicals. Decorative landscape rock was also placed on the railroad track siding and covered up evidence of contamination.

In the 1970's Union Oil conducted several studies of the site that noted the need for pollution control equipment and modernized facilities. One Union Oil memorandum in the 1970's justified selling the facility because of the "need for substantial capital investment for efficiency, environmental and safety."

The site was sold to Gopher Oil in November, 1980. Before Gopher Oil purchased the site, Union Oil misrepresented material facts to Gopher Oil about the condition of the site.

### 5. Gopher Oil's Cleanup Efforts

Gopher Oil operated the facility for approximately three years, and then moved its operation to a new site in Golden Valley, Minnesota. In late 1983 and 1984, officials from the Minnesota Pollution Control Agency ("MPCA") inspected the site and asked Gopher Oil to conduct an investigation to determine if the site was contaminated. Gopher Oil hired Twin City Testing Company ("TCT") to conduct an investigation in late 1984 and 1985. In September, 1985, TCT submitted a report concluding that the site was contaminated with oil and industrial chemicals.

As the current property owner, Gopher Oil entered into a compliance agreement with the MPCA to investigate and clean up the contamination.

To date, Gopher Oil has spent $423,-272.81 pursuant to MPCA requests and the MPCA compliance agreement. Based on the testimony at trial, the court finds that such costs were necessary to respond to the contamination and that such costs were reasonable and necessary to remove the contamination.

Gopher Oil has hired experts to investigate the extent and nature of the contamination. It has paid for testing of proposed contamination remedies (bio-remediation). It has made proposals for remediation and continues to cooperate with the MPCA in developing an appropriate remedy. The MPCA has acknowledged Gopher Oil's good faith efforts to clean up the site. Based on the testimony at trial the court finds that Gopher Oil's activities to date have promoted a cost effective and environmentally safe cleanup of the site and that such actions are consistent with the National Contingency Plan, 40 C.F.R. Part 300, *et seq.* ("NCP").

Union Oil knew of and is responsible for the leaking, spilling and dumping of oil and industrial chemicals resulting in contamination of the site. Gopher Oil did not materially contribute to the contamination and did not have specific knowledge of the contamination until investigations and testing were conducted in 1985. The contamination Union Oil caused is extensive and of a

toxic nature. The contamination Union Oil caused evidences a lack of care exercised in the blending, packaging and disposing of oil and industrial chemicals by Union Oil.

## B. CONCLUSIONS OF LAW

Based on the findings of fact above for Gopher Oil's CERCLA and MERLA claims, the court concludes:

1. There was a release of hazardous substances at the site as defined by 42 U.S.C. § 9601(14) and (22) and Minn.Stat. § 115B.02(5) and (15).

2. The site is a facility as defined by 42 U.S.C. § 9601(9) and Minn.Stat. § 115B.02(5).

3. The release caused Gopher Oil to incur necessary response costs at this site as defined by 42 U.S.C. § 9601(9) and Minn. Stat. § 115B.02(5).

4. The release caused Gopher Oil to incur reasonable and necessary removal costs at the site as defined by 42 U.S.C. § 9607.

5. Union Oil is a responsible person as an owner and operator of the site at the time hazardous substances were released there by its Barber Oil and AMSCO operations as defined by 42 U.S.C. § 9607 and Minn.Stat. § 115B.04.

6. Union Oil is a responsible person as a generator who arranged for the disposal of hazardous substances at the site through its practice of sending Union Oil products containing hazardous substances to the facility for blending to its specifications, retaining title over the product while at the facility, and disposing of waste byproducts during the blending process at the site as defined by 42 U.S.C. § 9607 and Minn.Stat. § 115B.04.

7. Gopher Oil has incurred $423,272.81 in costs necessary to respond to the releases at the site as defined by 42 U.S.C. § 9607.

8. Gopher Oil has incurred $423,272.81 in reasonable and necessary removal costs to respond to the release at the site as defined by Minn.Stat. § 115B.04.

9. The necessary response costs incurred by Gopher Oil are consistent with the National Contingency Plan ("NCP"), 40 CFR Part 300, et seq.

10. The reasonable and necessary removal costs of $423,272.81 incurred by Gopher oil are consistent with the National Contingency Plan ("NCP"), 40 CFR Part 300, et seq.

11. Gopher Oil is entitled to judgment in the amount of $423,272.81 plus costs and disbursements and prejudgment interest in the amount of $93,572.34 in accordance with 42 U.S.C. § 9607 and Minn.Stat. § 115B.04 and pursuant to 42 U.S.C. § 9607(a)(4).

12. Gopher Oil is entitled to a judgment declaring that Union Oil is solely responsible for all future costs of investigating and cleaning up the site in accordance with 42 U.S.C. §§ 9607 and 9613, and Minn. Stat. §§ 115B.04 and 115B.08.

13. Gopher Oil is entitled to a judgment declaring that Union Oil is 100% liable for any future necessary costs of response Gopher Oil may incur at the site in accordance with 42 U.S.C. §§ 9607 and 9613.

14. Gopher Oil is entitled to a judgment declaring that Union Oil is 100% liable for any reasonable and necessary removal costs Gopher Oil may incur at the site in accordance with Minn.Stat. §§ 115B.04 and 115B.08.

## II. FRAUD

### A. FINDINGS OF FACT

Gopher Oil's fraud claim was properly submitted to the jury and the court now incorporates by reference the jury's answers to the questions propounded in the special verdict. The jury found that Union Oil had misrepresented the condition of the site. The jury also found that Gopher Oil suffered $1,823,272.81 in damages as a direct result of Union Oil's misrepresentation regarding the condition of the site. The parties agree that the $1,823,272.81 in damages was the sum of the $1,400,000 Gopher Oil paid Union Oil for the purchase of the property and the $423,272.81 that Gopher Oil has already incurred in cleanup costs.

## B. CONCLUSIONS OF LAW

In its special verdict, the jury found that Union Oil is liable to Gopher Oil for fraud. The court will address each component of the jury's damages award separately.

### 1. *The Purchase Price of the Site*

 The proper measure of damages in a fraud action is a matter of substantive law, governed by the law of the place where the wrongful act occurred. *Lowrey v. Dingmann,* 251 Minn. 124, 129, 86 N.W.2d 499, 503 (1957). In Minnesota the rule of recovery for fraud is the "out-of-pocket" damages rule. *Johnson Building Co. v. River Bluff Development,* 374 N.W.2d 187, 195 (Minn.Ct.App.1985) (citing *Lewis v. Citizens Agency of Madelia, Inc.,* 306 Minn. 194, 199, 235 N.W.2d 831, 835 (1975)). Under the out-of-pocket rule the issue is not what the injured party might have gained through the transaction but what was lost by reason of the other party's misrepresentations. The loss is usually measured as the difference between what the injured party parted with and what he received. *Id.* (citing *Strouth v. Wilkison,* 302 Minn. 297, 300, 224 N.W.2d 511, 514 (1974)). In essence, the out-of-pocket measure of damages is the difference between the actual value of the property received and the price paid for it, together with such other damages as were naturally and proximately caused by the fraud.

The court has thoroughly examined the Minnesota cases involving fraudulent misrepresentations in the sale of real estate and has concluded that the Minnesota courts have never been faced with a case which is substantially similar to the case now before the court. *See e.g. Nave v. Dovolos,* 395 N.W.2d 393 (Minn.Ct.App. 1986) (where seller represented buyer to that home contained hardwood floors, the measure of damages for the fraudulent misrepresentation was the amount paid less the fair market value of the property); *Peterson v. Johnston,* 254 N.W.2d 360 (Minn.1977) (where a portion of an adjacent lot was subsequently used as an entrance ramp for a state highway and purchasers claimed that the seller represented the lot would simply be landscaped, if the trial court had found seller fraudulently represented the use of the adjacent property, damages would have equaled the amount paid less the fair market value of the property); *Tysk v. Griggs,* 253 Minn. 86, 91 N.W.2d 127 (1958) (where down payment on property included three contracts for deed, if the value of the contracts had been misrepresented the damages would have equaled the difference in value of what was given and what was received for the property); *Marion v. Miller,* 237 Minn. 306, 55 N.W.2d 52 (1952) (where seller misrepresented gross income of resort property, damages under Minnesota law would equal the difference in value between what was given and what was received for the property).

 Citing expert trial testimony, plaintiff argues that the current actual value of the property is zero. There is no dispute that the purchase price of the property was $1,400,000. Consequently, plaintiff argues that it is entitled to $1,400,000 as the difference between the value of the property and the price paid for it. The court disagrees.

Although it is true that there was expert testimony at trial that the property is currently worthless, the court is not convinced that the plaintiff should receive a damages award of $1,400,000 and also be allowed to retain ownership of the property. Although the property may currently be worthless, because of its contamination, it will not continue to be worthless after the defendant has complied with its obligations under CERCLA and MERLA. The Minnesota Supreme Court has recognized an exception to the general rule when out-of-pocket damages fail to return a party to the status quo. *Hughes v. Sinclair Marketing, Inc.,* 389 N.W.2d 194, 199 (Minn. 1986) (citing *Lewis v. Citizens Agency of Madelia, Inc.,* 306 Minn. 194, 235 N.W.2d 831 (1975)); *See also Johnson Building Co.,* 374 N.W.2d at 195. In both *Hughes* and *Lewis,* the Minnesota Supreme Court recognized that the overriding policy behind the out-of-pocket damages rule is to

return the parties to the status quo. This is precisely what the court's order will accomplish. By holding the defendant liable for all past and future cleanup costs under CERCLA and MERLA, the court has assured plaintiff that it will receive a "clean" piece of land and will not incur any costs in addition to its original purchase price. If the court were now to order judgment against the defendant for the purchase price of the property which the plaintiff owns, has used and will continue to have use of, the plaintiff would receive a double recovery and the damages award would be punitive. There is no support in Minnesota law for such a double or punitive award. When the property has been cleaned up in accordance with the dictates of the state and federal environmental regulatory agencies, plaintiff will still have control and use of the property it purchased and will not have incurred any additional expenses and will be returned to the status quo.

The Minnesota Supreme Court's exception which allows damages to be awarded with the goal of returning a party to the status quo comports well with and effectuates the policy considerations which underlie the out-of-pocket damages rule. For example, Williston recognizes a "right to damages for being led into the transaction." And explains that "[u]nder this form of relief the injured party does not seek to undue the fraudulent transaction, but claims sufficient compensation to make his position as good as it would have been had he not entered into the transaction at all." 12 W.H.E. Jaeger, *Williston on Contracts* § 1523 (3d Ed.1970). Similarly, the California Supreme Court has recognized that the out-of-pocket rule "is directed to restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction, and thus awards the difference in actual value at the time of the transaction between what the plaintiff gave and what he received." *Stout v. Turney*, 22 Cal.3d 718, 725, 150 Cal.Rptr. 637, 640, 586 P.2d 1228, 1232 (1978).

■ Generally the out-of-pocket rule measures damages by comparing what was paid for the property with the actual value of the property on the date of the sale in question. The court recognizes this general proposition, but has found authority which allows for consideration of circumstances occurring subsequent to the sale. A number of cases have held that where strict application of the date-of-sale rule would not adequately compensate a party for his or her actual out-of-pocket loss, it is appropriate to consider subsequent circumstances. *See e.g. Burkhouse v. Phillips*, 18 Cal.App.3d 661, 96 Cal.Rptr. 197 (1971); *Garrett v. Perry*, 53 Cal.2d 178, 184, 346 P.2d 758, 762 (1959) (holding that the out-of-pocket rule "must be applied realistically so as to give the defrauded person his actual out-of-pocket loss, and, when necessary to reach that result, the court must consider subsequent circumstances."); *Feckenscher v. Gamble*, 12 Cal.2d 482, 85 P.2d 885 (1938). In order to give Gopher its actual out-of-pocket loss it is necessary to consider circumstances which will occur subsequent to the sale of the site. Namely, it is necessary to consider the effect that the cleanup activities which CERCLA and MERLA dictate will have on the value of the property. Because this cleanup has not yet occurred, the court does not have a sufficiently established factual basis on which to render a decision on the plaintiff's fraud claim. Accordingly, the court will order entry of judgment on the CERCLA and MERLA claims but will retain jurisdiction over the fraud claim until the ordered cleanup has been substantially completed. When the cleanup of the site is substantially complete, the court will receive evidence on the value of the clean property and will then make a determination of what relief plaintiff is entitled to under its fraud claim. As the out-of-pocket damages rule requires, this determination will focus on the difference between the purchase price and the value of the clean site.

This conclusion, forced on the court by the requirements of the environmental protection laws juxtaposed to the common law, is consistent with the out-of-pocket rule because it focuses on what the ultimate actual value of the property will be after the cleanup is complete rather than on what the current value of the property is when viewed in isolation from the totality

of this court's order. Moreover, to establish a position of status quo and not to award the plaintiff the original purchase price of the property in addition to cleanup costs, at this time, is consistent with the Minnesota Supreme Court's decision to adopt the out-of-pocket damages rule as opposed to the benefit-of-the-bargain damages rule. *See Lowrey v. Dingmann*, 251 Minn. 124, 129, 86 N.W.2d 499, 502–03 (1957).

### 2. *Past Cleanup Costs*

■ With respect to the $423,272.81 that plaintiff has already incurred in cleanup costs, the court concludes that plaintiff is entitled to this amount as "other damages proximately caused by the fraud." *See Johnson*, 374 N.W.2d at 195. It is clear that plaintiff was required to spend the amount of money it did on cleanup costs and that the expenditure was not optional. Consequently, there is no question that the cleanup costs already incurred were other damages proximately caused by the fraud. Accordingly, defendant is liable to plaintiff under plaintiff's common law fraud claim for $423,272.81.

Plaintiff is also entitled to prejudgment interest on the $423,272.81 awarded under its common law fraud claim. *See Clements Auto Co. v. Service Bureau Corp.*, 444 F.2d 169, 189 (8th Cir.1971) (citing *Moosbrugger v. McGraw–Edison Co.*, 284 Minn. 143, 170 N.W.2d 72 (1969)) (other citations omitted); *cf.* Minn.Stat. § 549.09. Because of the limitation on recovery set forth at 42 U.S.C. § 9614(b), however, the award of $423,272.81 and the prejudgment interest thereon will not be awarded to plaintiff in addition to the award under CERCLA and MERLA outlined above. These fraud damages and prejudgment interest thereon will only be awarded to plaintiff in the event that the CERCLA and MERLA awards for past cleanup costs are found to be inappropriate.

### III. ORDER FOR ENTRY OF JUDGMENT ON PLAINTIFF'S FRAUD, CERCLA AND MERLA CLAIMS

Based on the court's findings of fact and conclusions of law IT IS HEREBY ORDERED:

1. That judgment be entered in the amount of $423,272.81 plus costs and disbursements and prejudgment interest in the amount of $93,572.34 against defendant Union Oil Company of California and in favor of plaintiff Gopher Oil Company, Inc.

2. That judgment be entered declaring that defendant Union Oil Company of California is solely responsible for future costs of investigating, cleaning up and otherwise responding to the contaminated site located at 825 Thornton Avenue S.E., Minneapolis, Minnesota, and also declaring that defendant Union Oil Company of California is 100% liable for any necessary response costs and for future reasonable and necessary removal costs plaintiff Gopher Oil Company, Inc. may incur in connection with the contaminated site located at 825 Thornton Avenue S.E., Minneapolis, Minnesota.

3. The court will retain jurisdiction over plaintiff's fraud claim and will determine the damages due thereunder after the cleanup at the Thornton Avenue site has been substantially completed.

### ORDER

#### Filed Nov. 23, 1990

IT IS HEREBY ORDERED that the judgment entered in this matter on October 12, 1990, is vacated.

### ORDER

#### Filed Nov. 20, 1990

This matter is before the court on the motion of plaintiff Gopher Oil Company, Inc. for entry of judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. Defendant Union Oil Company of California does not oppose the motion. Based on the file, record, proceedings herein and this court's order dated October 12, 1990, the court concludes that plaintiff's motion should be granted.

Accordingly, IT IS HEREBY ORDERED that:

1. There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules

of Civil Procedure, the Clerk shall enter final judgment in the amount of $423,-272.81 plus prejudgment interest in the amount of $93,572.34 plus post-judgment interest in the amount of $4,794.00, against defendant Union Oil Company of California and in favor of plaintiff Gopher Oil Company, Inc.

2. There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk shall enter final judgment declaring that defendant Union Oil Company of California is solely responsible for the future costs of investigating, cleaning up and otherwise responding to the contaminated site located at 825 Thornton Avenue S.E., Minneapolis, Minnesota, and also declaring that defendant Union Oil Company of California is 100 percent liable for any necessary response costs and for future reasonable and necessary removal costs plaintiff Gopher Oil Company, Inc. may incur in connection with the contaminated site located at 825 Thornton Avenue S.E., Minneapolis, Minnesota.

3. The court will retain jurisdiction over plaintiff's fraud claim and will determine the damages due thereunder after the cleanup at the Thornton Avenue site has been substantially completed.

LET JUDGMENT BE ENTERED ACCORDINGLY.