# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A24-1981

Renee Hogendorf,
Respondent,

vs.

James J. Green, Jr., et al.,
Appellants.

**Filed September 15, 2025**
**Affirmed**
**Wheelock, Judge**

Anoka County District Court
File No. 02-CV-22-678

William A. Cumming, Laura H. Lindsay, William M. Florek, Hessian & McKasy, P.A., Minneapolis, Minnesota (for respondent)

Cara C. Passaro, Stephen P. Couillard, Stich Angell, P.A., Minneapolis, Minnesota (for appellants)

Considered and decided by Wheelock, Presiding Judge; Ross, Judge; and Connolly, Judge.

## SYLLABUS

1.      The state's involvement in the investigation or cleanup of a released hazardous substance does not preclude a claim under the Minnesota Environmental Response and Liability Act (MERLA), Minn. Stat. §§ 115B.01-.20 (2024).

2.      As it appears in the definition of "release" under Minn. Stat. § 115B.02, subd. 15(b)(4), the term "residue" does not include "rinsate" as defined by Minn. Stat. § 18B.01, subd. 25 (2024).

3.     Whether damages awarded under Minn. Stat. § 115B.04 are "reasonable and necessary" is a factual determination for the district court.

4.     A party may be awarded damages for the diminution of value of their property under Minn. Stat. § 115B.05.

## OPINION

**WHEELOCK**, Judge

Appellants challenge the district court's entry of judgment and award of damages in favor of respondent under the Minnesota Environmental Response and Liability Act (MERLA), Minn. Stat. §§ 115B.01-.20, based on appellants' discharge of contaminating substances from their commercial landscaping workshop onto respondent's neighboring property. Appellants assert that the district court erred under MERLA's definitions by (1) concluding that disposal of pesticide rinsate is a "release . . . of a hazardous substance," (2) determining that appellant James J. Green Jr. was a "responsible person," (3) awarding damages that were not "reasonable and necessary," and (4) awarding diminution-of-value damages. We affirm.

## FACTS

Appellant Green and respondent Renee Hogendorf are neighboring landowners in the City of Andover in Anoka County. Green owns and operates appellant Well Groomed Lawns Inc. (WGL), a landscaping business, on his property. This litigation stems from Hogendorf's discovery of a pipe that carried rinsate from WGL's workshop on Green's

2

property and discharged onto Hogendorf's property. Hogendorf sued WGL and Green[1] under MERLA and obtained a damages judgment following a bench trial. Appellants challenge both the district court's determination of liability under MERLA and its award of damages. The following summarizes the facts relevant to the resolution of this appeal, based on the evidence presented at trial and viewed in the light most favorable to the judgment. *See Rogers v. Moore*, 603 N.W.2d 650, 656 (Minn. 1999).

In May 2021, Hogendorf was walking on her property when she saw something white sticking out of the ground. Hogendorf spotted a four-inch pipe covered in dirt and vegetation and observed fluid streaming from the pipe. The fluid "had a horrible, foul stench to it." Hogendorf contacted Landmark Environmental, an environmental consulting firm, and it collected soil samples from her property around the discharge pipe. The samples revealed the presence of many contaminating substances in Hogendorf's soil, including triclopyr, 2,4-D, and dicamba—chemicals found in common pesticides. Landmark then notified the state, and an environmental health inspector for Anoka County scheduled a visit to Hogendorf's and Green's properties.

Green owns property next to Hogendorf's from which he operates WGL. Green built a garage workshop on his property for WGL and ran a pipe from the floor of the workshop to a drain field that he constructed on his property; WGL used this pipe for about 20 years until it became clogged. When it became clogged, Green directed WGL's general

---

[1] Green and WGL each had their own counsel, but throughout most of the proceedings in district court and in most of the district court's order, they are treated as one. In this opinion, we address them together as appellants unless explicitly differentiated.

foreman to install a new pipe that discharged near the property line. Green told the foreman where on his property to place the pipe. The new pipe extended approximately 47 feet past the property line onto Hogendorf's property. Inside the workshop, WGL performed mechanical repairs and maintenance on its mowers and the tools it used to apply various chemicals, including pesticides and herbicides. WGL also cleaned its vehicles, mowers, and tools in the garage, washing the chemicals and grime from them down the drain and through the pipe that ultimately discharged rinsate onto Hogendorf's property.

After the environmental health inspector's visits to Hogendorf's and Green's properties, the Minnesota Department of Agriculture (MDA) issued a notice of violation to WGL and later issued a special order for compliance, requiring WGL to conduct a remedial investigation and take corrective action as to the areas that had been affected by WGL's actions. The Minnesota Pollution Control Agency (MPCA) also issued a notice of violation to WGL and ordered WGL to remove or seal the pipe and develop plans to investigate and remove the contamination. Notwithstanding these orders, WGL did not change its practices and continued to allow its discharge to flow onto Hogendorf's property. Eventually, WGL hired an environmental consultant, Pinnacle Engineering, which drafted an investigation-and-work plan for the contamination. The parties, the MDA, and the MPCA agreed that Landmark would assist in the investigation of and planning to remove the contamination from Hogendorf's property.

Pinnacle's investigation began more than a year after Hogendorf discovered the discharge pipe on her property and took several months to complete. During and after the investigation, Pinnacle and Landmark collaborated to develop a work plan to remove the

4

contamination from Hogendorf's property and manage appellants' continued discharge of rinsate. The MDA ultimately approved the plan. Data from soil samples established that a large quantity of soil would need to be removed to a depth of nine feet in some places and replaced in the area where the pipe discharged. At some point during the fall of 2023, Pinnacle completed its work under the work plan, and in 2024, both the MDA and the MPCA issued approval letters to Green and WGL.

Hogendorf filed her initial complaint in February 2022 and an amended complaint in March 2023. Hogendorf brought a MERLA claim, common-law claims for negligence, negligence per se, nuisance, and trespass, and various equitable claims. Appellants moved for summary judgment on Hogendorf's MERLA claims, arguing that the claims were superfluous after the state became involved in the investigation that there was no release of a hazardous substance. Hogendorf opposed the motion, and the district court denied it. The matter proceeded to a bench trial, after which the district court ordered judgment against appellants on the MERLA claim. The district court determined that appellants owned and operated the workshop and the pipe. The district court further determined that WGL's employees regularly rinsed pesticides containing 2,4-D and dicamba from the equipment and vehicles at the workshop and that Green directed WGL's employees to install the pipe in the location where it discharged the resulting rinsate onto Hogendorf's property. Thus, the district court determined that appellants were responsible for the release of hazardous substances from their facility onto Hogendorf's property.

Based on its determination that, under MERLA, Green and WGL were responsible for the contamination of Hogendorf's property, the district court awarded Hogendorf

5

declaratory relief, monetary damages for economic loss totaling $331,295.84, and reasonable attorney fees as the prevailing party. The district court did not decide Hogendorf's common-law claims because Hogendorf had succeeded in her MERLA claims and MERLA does not permit double recovery. *See* Minn. Stat. § 115B.13.

This appeal follows.

## ISSUES

I.  Does the state's involvement in investigation or cleanup of a hazardous substance after a release preclude a MERLA claim?

II.  Did the district court err in making its liability determinations under the definitions in MERLA, including that there was a "release," the release was of a "hazardous substance," and Green was a "responsible person"?

III.  Did the district court err in awarding damages, including by determining that Hogendorf's environmental-consultant costs were "reasonable and necessary" and that diminution-of-value damages were permitted by MERLA?

## ANALYSIS

We begin with an explanation of MERLA, which was enacted by the Minnesota Legislature in 1983 for three reasons: "(1) to impose strict liability on those responsible for harm caused by the release of hazardous substances; (2) to allow the state to clean up contamination and collect costs later; and (3) to fund state cleanup activity." *Musicland Grp., Inc. v. Ceridian Corp.*, 508 N.W.2d 524, 529 (Minn. App. 1993), *rev. denied* (Minn. Jan. 27, 1994). MERLA was adapted, in part, from the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA). *State ex*

6

*rel. Hatch v. Emps. Ins. of Wausau*, 644 N.W.2d 820, 824, 830 (Minn. App. 2002), *rev. denied* (Minn. Aug. 6, 2002). Because MERLA "provides a cause of action for the recovery of damages for personal injury and economic losses caused by the release of hazardous chemicals into the environment," it provides broader protection for individuals affected by contamination than CERCLA. *Musicland*, 508 N.W.2d at 529.

The objective of MERLA is to go beyond being a "cleanup statute" to "protect the public health and minimize the harmful effect of hazardous substances in the environment." *Id.* at 530. To that end, MERLA protects against not only *actual* releases of chemicals but *threatened* releases. *Id.*; *see* Minn. Stat. § 115B.04, subd. 1 ("[A]ny person who is responsible for a *release or threatened release* of a hazardous substance from a facility is strictly liable . . . ." (emphasis added)). "MERLA is a remedial statute and should therefore be broadly construed in favor of the government in order to effectuate its remedial objectives." *Hatch*, 644 N.W.2d at 829; *see Musicland*, 508 N.W.2d at 531-32 (broadly construing both "release" and "facility" as defined in MERLA).

The agencies that administer MERLA are the MDA and the MPCA (collectively, the agencies). Minn. Stat. § 115B.02, subd. 3. The MDA has jurisdiction under MERLA when the hazardous substances involved are agricultural chemicals, including pesticides and fertilizers. *Id.*, subds. 3, 3a. Any other hazardous substance falls under the MPCA's jurisdiction. *Id.*, subd. 3. Under MERLA, the agencies have authority to "impose a legal obligation" on property owners and may seek a civil judgment "to compel the [owner] to conduct the clean up or to compel reimbursement of [the agencies'] expenses in cleaning up the contamination." *Minn. Mining & Mfg. Co. v. Travelers Indem. Co.*, 457 N.W.2d

7

175, 183 (Minn. 1990); *see also* Minn. Stat. § 115B.18 (listing relief available to state for noncompliance). MERLA did not create a new scheme for liability to address contamination from pollution; rather, it updated the remedies available under previous statutes and the common law. *Minn. Mining & Mfg. Co.*, 457 N.W.2d at 183.

"On appeal from judgment following a court trial, this court reviews whether the district court's findings were clearly erroneous and whether the district court erred as a matter of law." *In re Distrib. of Attorney's Fees*, 855 N.W.2d 760, 761 (Minn. App. 2014), *aff'd*, 870 N.W.2d 755 (Minn. 2015). Appellate courts "review a district court's application of the law de novo." *Harlow v. State, Dep't of Hum. Servs.*, 883 N.W.2d 561, 568 (Minn. 2016). A district court's factual findings are reviewed for clear error, requiring that there be reasonable evidence in the record to support these findings. *Rasmussen v. Two Harbors Fish Co.*, 832 N.W.2d 790, 797 (Minn. 2013). When reviewing the findings of fact, appellate courts "view the evidence in the light most favorable to the verdict" and will not determine that the findings are clearly erroneous unless the reviewing court is "left with the definite and firm conviction that a mistake has been made." *Id.* (quotations omitted).

With these legal standards in mind, we address appellants' arguments. Appellants argue that the district court erred (1) when it determined that Hogendorf's claim was not superfluous to the agencies' actions; (2) when it determined that appellants were liable to Hogendorf under MERLA; (3) when it determined that Green was personally liable as a "responsible person" under MERLA; and (4) in its calculation of Hogendorf's damages. We address these arguments in turn.

**I.** **The state's involvement in the investigation or cleanup of a hazardous substance after a release does not preclude a private cause of action under MERLA.**

We first consider appellants' argument that Hogendorf's MERLA claim became superfluous after the agencies took action under the statute. They reason that MERLA acts as a "whistleblower statute" and that, because the act of notifying the state satisfied the purpose of bringing a MERLA claim, it was unnecessary and not allowed for Hogendorf to file a claim under MERLA once the state was notified of the release. We review the district court's determination that, "[b]ased upon the unambiguous language of the statute, [Hogendorf] is entitled to all reasonable and necessary removal costs" and that agency action does not preclude a private cause of action under MERLA. Statutory interpretation is a question of law that appellate courts review de novo. *Cocchiarella v. Driggs*, 884 N.W.2d 621, 624 (Minn. 2016).

Appellants' argument directly conflicts with the plain language of MERLA. First, the purpose of MERLA is to provide any injured party, not only the state, with a cause of action to recover the costs incurred because of the liable party's release of a hazardous substance. *See* Minn. Stat. § 115B.04, subd. 1(2) (permitting recovery of "all reasonable and necessary removal costs incurred *by any person*" (emphasis added)); *Musicland*, 508 N.W.2d at 529 (explaining that MERLA "provides a cause of action for the recovery of damages for personal injury and economic losses caused by the release of hazardous chemicals into the environment"). Second, because the agencies investigated the report and participated in developing the work plan for the environmental consultants to investigate and remediate the damage to her property, the state's involvement caused

9

Hogendorf to incur some of the specific removal costs she seeks to recover in this lawsuit. We thus hold that the state's involvement in the investigation or cleanup of a hazardous substance after a release under MERLA does not preclude a private cause of action under MERLA or make one superfluous.

Next, we turn to appellants' arguments based on the district court's interpretation of MERLA and its determinations that appellants are liable under it.

## II. The district court correctly determined that, under MERLA's definitions, a release of a hazardous substance occurred and Green was a responsible person.

Appellants challenge the district court's determinations that appellants were liable under the definitions in MERLA.

To succeed in recovering damages for a claim brought under MERLA, Hogendorf needed to prove four elements: (1) appellants were responsible (2) for the release (3) of a hazardous substance (4) from a facility. *See* Minn. Stat. §§ 115B.04, subd. 1, .05, subd. 1. MERLA defines the terms it uses in each of these elements. Minn. Stat. §§ 115B.02, subd. 5 ("facility"), subd. 8 ("hazardous substance"), subd. 15 ("release"), .03 ("responsible person"). The district court determined that appellants owned and operated the workshop and the pipe. The district court further determined that WGL's employees regularly rinsed pesticides containing 2,4-D and dicamba from the equipment and vehicles at the workshop and that Green directed WGL's employes to install the pipe in the location where it discharged the resulting rinsate onto Hogendorf's property. Thus, the district court determined that appellants were responsible for the release of hazardous substances from their facility onto Hogendorf's property.

10

Appellants challenge the district court's findings of fact and conclusions of law on each element except the finding and conclusion that appellants' workshop on Green's property and the pipe from it discharging rinsate onto an area of Hogendorf's property is a "facility" within the meaning of MERLA. We first consider whether there was a "release" of a "hazardous substance," and then we consider whether Green was a "responsible person."

> **A.** **The district court did not abuse its discretion in determining that appellants' discharge of pesticide rinsate was a "release" of a "hazardous substance" under MERLA and did not fall within the agricultural exception.**

To address appellants' argument that Hogendorf failed to prove that the discharge onto her property was a "release" of a "hazardous substance," we must interpret MERLA. Statutory interpretation is a question of law that appellate courts review de novo. *Cocchiarella*, 884 N.W.2d at 624.

MERLA defines "release" to mean "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment which occurred at a point in time or which continues to occur." Minn. Stat. § 115B.02, subd. 15(a). This definition includes a number of exceptions. The parties ask us to interpret clause (b)(4) (the agricultural exception), which excepts "any release resulting from the application of fertilizer or agricultural or silvicultural chemicals, or disposal of emptied pesticide containers or residues from a pesticide as defined in section 18B.01, subdivision 18." *Id.*, subd. 15(b)(4). Chapter 18B relates to pesticide control and includes a definition of "pesticide": "a substance or mixture of substances intended to

prevent, destroy, repel, or mitigate a pest, and a substance or mixture of substances intended for use as a plant regulator, defoliant, or desiccant." Minn. Stat. § 18B.01, subd. 18 (2024).

The parties do not dispute the district court's findings that the pipe from appellants' workshop discharged rinsate created by the rinsing of pesticides from appellants' equipment and vehicles and that the pesticide rinsate contained substances that are defined as "hazardous substances" under MERLA.[2]

Instead, appellants contend that pesticide rinsate from their landscaping equipment and vehicles falls within the agricultural exception to MERLA's definition of a "release," which exempts the "disposal of emptied pesticide containers or residues from a pesticide." Minn. Stat. § 115B.02, subd. 15(b)(4). Relying on a definition in chapter 18B, appellants assert that rinsate is created from the disposal of residues of pesticide within the agricultural exception, *id.*, because "rinsate" is "a dilute mixture of a pesticide or pesticides with water, solvents, oils, commercial rinsing agents, or other substances, that is produced by or results from the cleaning of pesticide application equipment or pesticide containers," Minn. Stat. § 18B.01, subd. 25. Hogendorf argues that appellants' contention equates "rinsate" from one chapter of the Minnesota Statutes with "residue" from another, which is contrary to

---

[2] MERLA incorporates as hazardous substances the hazards and pollutants identified by the federal Clean Air Act (CAA), 42 U.S.C. § 7412 (2018), and the chemicals identified by the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. § 1321(b)(2)(A) (2018). Minn. Stat. § 115B.02, subd. 8. Minnesota Statutes section 115B.02, subdivision 8, refers to the FWPCA, much of which, including section 1321, has been recodified as part of the Clean Water Act (CWA). Dicamba and 2,4-D, which are chemicals found in common pesticides, are included in the list of hazardous substances identified by the CWA and incorporated into MERLA. 40 C.F.R. § 116 (2025).

the terms' distinct meanings and statutory contexts. She also argues that the disposal of pesticide "residue" within the agricultural exception cannot be so broadly interpreted as to include appellants' discharge of pesticide rinsate from cleaning their equipment and vehicles.

"The object of all statutory interpretation is to ascertain and effectuate the intention of the Legislature," and if the statute is unambiguous, appellate courts "interpret it according to the plain meaning of its text." *Pfoser v. Harpstead*, 939 N.W.2d 298, 310 (Minn. App. 2020) (quotation omitted), *aff'd*, 953 N.W.2d 507 (Minn. 2021). When a term is defined in a statute, appellate courts apply the definition provided by the legislature, and if there is no statutory definition, courts may consider dictionary definitions to determine the word's plain meaning. *Wayzata Nissan, LLC v. Nissan N. Am., Inc.*, 875 N.W.2d 279, 286 (Minn. 2016). The interpretation of a statute cannot be "inconsistent with the manifest intent of the legislature, or repugnant to the context of the statute." Minn. Stat. § 645.08 (2024). Therefore, the "specific meaning of a word depends on how it is being used in context." *Buzzell v. Walz*, 974 N.W.2d 256, 261 (Minn. 2022) (quotation omitted).

Appellate courts consider a statute to be ambiguous "only if, as applied to the facts of the particular case, [the words of the statute are] susceptible to more than one reasonable interpretation." *State v. Moore*, 10 N.W.3d 676, 680 (Minn. 2024). When a statute is ambiguous, courts turn to the canons of construction to determine the meaning of the

13

statute.  *State v. Thonesavanh*, 904 N.W.2d 432, 436 (Minn. 2017).  To determine the legislative intent, courts may consider, among other things, the following:

> (1) the occasion and necessity for the law; (2) the circumstances under which it was enacted; (3) the mischief to be remedied; (4) the object to be attained; (5) the former law, if any, including other laws upon the same or similar subjects; (6) the consequences of a particular interpretation; (7) the contemporaneous legislative history; and (8) legislative and administrative interpretations of the statute.

Minn. Stat. § 645.16 (2024); *see Christianson v. Henke*, 831 N.W.2d 532, 537 (Minn. 2013) (stating that, if a statute is ambiguous, we "may consider the factors set forth by the [l]egislature for interpreting a statute." (quotation omitted)).  Additionally, when interpreting an ambiguous statute, courts presume that the legislature did not intend "a result that is absurd," but intended for "the entire statute to be effective" and "to favor the public interest as against any private interest."  Minn. Stat. § 645.17 (2024).  An appellate court need not fully define an ambiguous term to resolve an appeal.  *See Moore*, 10 N.W.3d at 681.

Returning to the parties' arguments, we observe that their disagreement on the meaning of "residue" as used in the agricultural exception focuses on the origin or quantity of pesticide contemplated by the term.  Appellants' argument imports limitations from another chapter of the Minnesota Statutes to assert that *any* pesticide rinsate that results from the cleaning of pesticide application equipment or pesticide containers falls within the agricultural exception as the disposal of pesticide residue; Hogendorf argues that appellants' limitation cannot be correct because it does not come from the language or context of MERLA and that the agricultural exception for disposal of pesticide residue is

14

for a de minimis amount of pesticides and not as broad as the definition of rinsate. The parties' arguments in their primary briefs implicitly agree that some limitation on the term "residues" is necessary for a reasonable interpretation of the agricultural exception. The term "residues" is not defined in MERLA; we therefore look to dictionary definitions to determine its plain meaning. *See Wayzata Nissan, LLC*, 875 N.W.2d at 286.

Dictionary definitions of the term "residue" are nearly uniform: it is "[t]he remainder of something after removal of parts or a part." *The American Heritage Dictionary of the English Language* 1494 (5th ed. 2018); *accord Black's Law Dictionary* 1569 (12th ed. 2024); *Merriam-Webster's Collegiate Dictionary* 1060 (11th ed. 2003). This is a broad definition that, alone, does not provide a limitation on the origin or quantity of pesticide contemplated by the word "residues." It could reasonably accommodate the limitations appellants offer from the definition of rinsate; but it could also reasonably accommodate stricter limitations that exclude rinsate, as Hogendorf urges. Because the text of the agricultural exception does not clearly limit the term "residues" with respect to origin or quantity of pesticide, it is susceptible to more than one reasonable interpretation and thus is ambiguous.

Because the statute is ambiguous, we consider canons of construction and other tools to identify the legislative intent of the agricultural exception. When construing statutory language, we ascertain legislative intent by considering, among other things, the legislative history of the act under consideration, the subject matter as a whole, the purpose of the legislation, and the objects intended to be secured thereby." *Staab v. Diocese of St. Cloud*, 853 N.W.2d 713, 718 (Minn. 2014) (quotation omitted).

By reviewing the legislative history and purpose of MERLA as a whole, we can determine the legislature's intent with respect to the term "residues."

Recall that MERLA was enacted by the Minnesota Legislature in 1983 for three reasons: "(1) to impose strict liability on those responsible for harm caused by the release of hazardous substances; (2) to allow the state to clean up contamination and collect costs later; and (3) to fund state cleanup activity." *Musicland*, 508 N.W.2d at 529. MERLA was passed subsequent to other similar legislation Minnesota adopted in the 1970s.

In 1974, the legislature enacted a law directing the MPCA to develop a comprehensive regulatory system for the storage, transport, treatment, and disposal of hazardous waste. 1974 Minn. Laws ch. 346, at 582 (codified at Minn. Stat. §§ 116.01-.45 (1982)). Then, in 1978, the legislature established the Joint Legislative Committee on Solid and Hazardous Waste, 1978 Minn. Laws ch. 728, at 800, which led to the enactment of the Waste Management Act of 1980, 1980 Minn. Laws ch. 564, at 786. But neither of these developments addressed or resolved the issue of legal responsibility for harm caused by the disposal of hazardous substances that would become the central focus of MERLA. *See id.*; 1978 Minn. Laws ch. 728, at 800.

Throughout the two and a half years that the legislature considered the bill that would become MERLA, the liability sections were consistently debated, and these debates highlight themes that the legislature considered while crafting MERLA.

The legislature focused on holding responsible the user of the hazardous substance by preventing the user from avoiding liability for harm resulting from the disposal of the hazardous substance. Proposed amendments to MERLA that would have allowed people

16

using hazardous substances to limit or avoid liability by arguing that their conduct was reasonable were defeated. State of Minnesota, *Journal of the Senate*, 72nd Sess. 4713-14, 4731-32 (Mar. 10, 1982). Even a proposal to lower the standard from strict liability for certain classes of users, including farmers and small business owners, was defeated. State of Minnesota, *Journal of the Senate*, 73rd Sess. 1758, 1760-61 (Apr. 26, 1983).

The drafters of MERLA were motivated to make recovery for plaintiffs easier. When determining how an injured party would prove causation under MERLA, the legislature rejected a requirement that the injured party establish a certain amount and duration of exposure to prove causation, instead adopting an amendment that required a plaintiff to show that they were "exposed to the hazardous substance" and that, "under all the circumstances, the release could reasonably have resulted in plaintiff's exposure to the substance in the amount and duration experienced by plaintiff." State of Minnesota, *Journal of the Senate*, 73rd Sess. 266 (Feb. 28, 1983). We see no indication that a minimal exposure requirement was adopted.

Given the legislature's reason for enacting MERLA and the themes that are evident in its debates while drafting MERLA, we determine that the interpretation of "residues" put forth by Hogendorf is more consistent with the legislative intent. Interpreting "residues" to exclude rinsate is consistent with the legislature's concerns at the time of MERLA's passage about pollution stemming from the improper disposal of hazardous substances and its desires to increase access to recovery for plaintiffs by not imposing quantity requirements for their claims under MERLA. In addition, appellants' interpretation of "residue" is at odds with MERLA's objective of imposing liability on the

17

party responsible for contaminating the environment. Under their interpretation, rinsate, which they suggest is the mixture of pesticide residue with water or another liquid, can be dumped into the environment at any volume without liability. This would contravene the objectives and themes illustrated by MERLA's legislative history.

Based on our statutory interpretation, we hold that the term "residue" as it appears in the definition of "release" under Minn. Stat. § 115B.02, subd. 15(b)(4), does not include rinsate as defined by Minn. Stat. § 18B.01, subd. 25. Because pesticide rinsate from cleaning equipment or vehicles is not within the agricultural exception to a release, the exception does not apply to appellants' discharge onto Hogendorf's property, and we conclude that the district court did not abuse its discretion by determining that appellants' discharge of pesticide rinsate was a "release" of a "hazardous substance" as defined by MERLA.[3]

**B.      The district court did not err by finding that Green is a "responsible person" under MERLA.**

Green challenges the district court's determination that he is a "responsible person" as defined by MERLA in Minn. Stat. § 115B.03.

---

[3] Appellants' challenge to the "hazardous substance" element for liability under MERLA depended on the exemption of the pesticide chemicals 2,4-D and dicamba under the agricultural exception. Accordingly, we need not reach their arguments with respect to other substances found on Hogendorf's property.

"We review a district court's application of the law de novo." *Harlow*, 883 N.W.2d at 568. MERLA states that a person is a "responsible person" if they owned or operated the facility

> (i) when the hazardous substance, or pollutant or contaminant, was placed or came to be located in or on the facility;
> (ii) when the hazardous substance, or pollutant or contaminant, was located in or on the facility but before the release; or
> (iii) during the time of the release or threatened release.

Minn. Stat. § 115B.03, subd. 1(1).

Green argues that the district court erred by determining that he was a responsible person under MERLA because it improperly considered him and WGL as a single entity when reaching this conclusion. He also argues that the district court did not consider the provision of MERLA that establishes when a property owner may be liable and that, as a property owner, he bears no liability under MERLA. Hogendorf argues that the record supports a determination that Green was involved in the release of hazardous substances, that he was the sole owner of WGL, and that, regardless of whether he is considered a facility owner or property owner for purposes of the MERLA analysis, he is liable under MERLA as a responsible person.

"The question of whether [a person] is an 'owner or operator' under MERLA hinges on whether [the person] was in a position of control over the treatment of the hazardous substances at the time of their release." *Musicland*, 508 N.W.2d at 533. A person "could be found to be an 'owner or operator' of the facility from which the hazardous substances were released if [they] exerted an ample degree of control over the facility." *Id.*

19

Green satisfies MERLA's definition of a responsible person as an "owner or operator" of the facility. Green exercised ample control over the workshop and pipe at the time the substances were released. The district court found, and appellants do not challenge, that "Green admitted being responsible for ordering the installation of the pipe" and that, at Green's direction, WGL's general foreman oversaw the installation of the pipe, including its placement out to the property line, which ended up extending several feet onto Hogendorf's property. Because we conclude that these undisputed facts adequately establish that Green "was in a position of control over the treatment of the hazardous substances at the time of their release," *id.*, the district court did not err by determining that Green is a responsible person under MERLA as the "owner or operator" of the facility. Accordingly, we need not reach whether Green is also a responsible person as the owner of real property.

In conclusion, the district court did not err in finding appellants liable under MERLA. To succeed on a claim brought under MERLA, Hogendorf needed to prove that (1) appellants were responsible (2) for the release (3) of a hazardous substance (4) from a facility. *See* Minn. Stat. §§ 115B.04, subd. 1, .05, subd. 1. Appellants did not challenge the district court's finding that the workshop and pipe are a "facility." As to the first element, the evidence in the record supports the district court's determination that Green was a responsible person as the operator of the facility. As to the second and third elements, interpreting MERLA reveals that the district court correctly determined that the agricultural exception to the definition of "release" that applies to pesticide "residue" does not include pesticide "rinsate" and, therefore, that there was a release of hazardous substances.

20

Because we conclude that the district court did not err by determining that appellants were liable under MERLA, we now consider appellants' arguments about the district court's damages award to Hogendorf.

**III.    The district court did not err in awarding damages based on its determinations that Hogendorf's environmental-consultant costs were "reasonable and necessary" and that diminution-of-value damages are permitted by MERLA.**

Appellants argue in the alternative that, even if the district court correctly concluded that they were liable under MERLA, the district court erred in its calculation of damages. MERLA authorizes the recovery of damages under sections 115B.04 and 115B.05.  Under section 115B.04, subdivision 1(2), a party may recover damages for costs associated with removing the contamination, so long as the costs are "reasonable and necessary."  Under section 115B.05, subdivision 1(1), a party may recover "all damages for actual economic loss" to real property.  The district court awarded Hogendorf damages under each section, and appellants challenge both awards.  We address each in turn.

**A.    The district court did not err by awarding damages under section 115B.04, subdivision 1, after finding that the costs Hogendorf incurred for Landmark's work were reasonable and necessary removal costs.**

As to the damages awarded pursuant to section 115B.04, appellants argue that the district court erred because the costs were not "reasonable and necessary removal costs" recoverable under Minn. Stat. § 115B.04, subd. 1(2).  Specifically, appellants challenge the damages award allowing Hogendorf to recover costs for the work completed by Landmark—her environmental consultant—asserting that Landmark's work was merely supervisory of removal work by other entities and thus was not reasonable and necessary.

21

Hogendorf responds that the district court did not err because it correctly determined that Landmark's work was not merely supervisory, based on the court's specific findings that Landmark's work was necessary to hold Green's environmental consultant, Pinnacle, accountable.

First, we review the district court's determination that Landmark's work fell within MERLA's definition of removal. "We review a district court's application of the law de novo." *Harlow*, 883 N.W.2d at 568. To the extent appellants challenge the district court's related findings of fact, we review those "for clear error, requiring that there be reasonable evidence in the record to support" them. *Rasmussen*, 832 N.W.2d at 797.

MERLA defines "removal" as

> (1) the cleanup or removal of a released hazardous substance, or a pollutant or contaminant, from the environment; . . .
> (3) actions necessary to monitor, test, analyze, and evaluate a release or threatened release of a hazardous substance, or a pollutant or contaminant;
> (4) disposal or processing of removed material; or
> (5) other actions necessary to prevent, minimize, or mitigate damage to the public health or welfare or the environment, which may otherwise result from a release or threatened release.

Minn. Stat. § 115B.02, subd. 17(a). The district court received evidence that included Landmark's notes describing the work it performed on Hogendorf's property. The notes explain that Landmark acquired and analyzed soil and water samples, coordinated with the state and county to conduct inspections, identified and investigated other signs of contamination, proposed cleanup and management options, and reviewed and provided input on work plans from the agencies and Pinnacle. The district court determined that

22

Landmark's work fell within the scope of "removal" and that "Landmark's involvement in the investigation was necessary, reasonable, and justifiable," reasoning that

> Landmark safeguarded [Hogendorf] during the process by holding Pinnacle accountable; it provided thoughtful input and critiques throughout the process in a collaborative manner, which produced better results overall. This finding contemplates that Landmark's duty is to its client, [Hogendorf], which necessarily colors some of its advice as biased in favor of its client; the same, however, can be said of Pinnacle. Moreover, the overall effect of these inherent biases was largely vitiated through agency oversight because the MDA and MPCA acted as arbiters or referees whenever a disagreement occurred with respect to Pinnacle and Landmark. Thus, the Court has high confidence in the fact that this adversarial process produced a prudent, fair, and equitable result that simply would not have occurred without Landmark's participation.

The district court's findings of fact are supported by the record, and the facts found are consistent with the plain language of MERLA's definition of "removal." Therefore, we conclude that the district court did not err in determining that Landmark's work was removal as defined in MERLA.

We next consider whether the removal costs were reasonable and necessary. The phrase "reasonable and necessary" is not defined in MERLA, but caselaw is instructive. In *Musicland*, this court interpreted the phrase broadly and reasoned that the costs of an environmental consultant were reasonable and necessary because its work furthered the investigation, supported cleanup of the contamination, and did not duplicate other work being done. 508 N.W.2d at 533. In that case, we affirmed the damages award for costs resulting from the environmental consultant's work because the work would "prevent the contamination from further adversely affecting the environment." *Id.*

23

Our review of the caselaw persuades us to hold that whether damages awarded under Minn. Stat. § 115B.04 are "reasonable and necessary" is a fact determination. Because it is a fact determination, we review the district court's factual findings for clear error and require that reasonable evidence in the record supports the findings. *See Rasmussen*, 832 N.W.2d at 797. We further hold that it is not clear error for a district court to find that the work of two or more environmental consultants was reasonable and necessary under MERLA, so long as the record supports the finding.

Applying that standard of review, we are satisfied that the district court did not clearly err when it found that Landmark's work was not duplicative of other work being done and was not supervisory, and therefore it did not err when it determined that Landmark's work was reasonable and necessary under MERLA.

The district court's finding that Landmark's work was not duplicative of other work is supported by the record. Landmark's environmental consultant testified at trial about the scope of Landmark's work on this project. In addition to the initial testing and investigation that Landmark completed for Hogendorf after she discovered the discharge pipe on her property, Landmark communicated with the MDA and the MPCA to request that the agencies open an investigation of Hogendorf's property. Landmark also assisted with the development of the work plan to remove the contamination from Hogendorf's property. During one review of the proposed plan, Landmark identified that no monitoring well had been installed near Hogendorf's drinking water well, and Landmark suggested this modification to the MDA. The MDA then required Pinnacle to install a monitoring well closer to Hogendorf's drinking water well to conduct more accurate testing and

24

monitoring of possible contamination. In another instance, Landmark disagreed with Pinnacle's conclusion that Hogendorf's deep groundwater[4] was not affected by the contamination because of what Pinnacle called a confining layer of silty sand and clay. The MDA did not originally agree with Landmark, and Landmark performed its own testing of the deep groundwater, consistent with the MPCA's recommendation, and discovered that the deep groundwater was contaminated by the hazardous substances. In response to Landmark's findings, the MDA required Pinnacle to investigate the deep groundwater and modify the work plan to address this contamination. An MDA employee also testified that Landmark's work was not duplicative of other work being done by Pinnacle or the agencies. All of these actions are consistent with this court's reasoning in *Musicland* that, if an environmental consultant's work is not duplicative of other work, furthers the investigation, and supports cleanup of the contamination, then it is a reasonable and necessary expense under MERLA. 508 N.W.2d at 533.

The district court's finding that Landmark did not serve in a supervisory role is also supported by the record. There were multiple instances in which the agencies disagreed with or did not adopt Landmark's recommendations. For example, Landmark recommended that the agencies conduct further investigation of Green's property due to possible contamination consistent with Hogendorf's, but the MDA chose to remain focused

---

[4] About ten feet below the surface of Hogendorf's property sits a silty sand and clay layer of earth that stretches from ten feet to about 36 feet below the surface, below which is another layer of groundwater. This second layer of groundwater is referred to as the "deep groundwater." The presence of contaminants in the deep groundwater increases the potential future risk to Hogendorf's drinking water because it demonstrates the migration of the contaminants further into the property.

25

on Hogendorf's property. Landmark also recommended that the MDA conduct deep groundwater testing or direct Pinnacle to do so, but the MDA disagreed and Landmark conducted the testing itself. An MDA employee who testified also expressed frustrations with Pinnacle's work during the project and explained his role to push back against Pinnacle and ensure that agency requirements were being met. These examples support the district court's finding that the agencies supervised the work, not Landmark.

Appellants urge us to follow *Kennedy Building Associates v. CBS Corp.*, a federal district court decision that limited the recovery of an environmental consultant's fees for a MERLA claim.[5] No. 99-CV-1833, 2010 WL 3024714, at *2-3 (D. Minn. Aug. 2, 2010) (determining that the costs "incurred to implement the remedy set forth in" the corrective-action plan were recoverable, but the costs incurred due to "an unhappy landowner's unilateral effort to 'supervise' the cleanup beyond what [was] required" by the state were not covered by MERLA). But *CBS Corp.* is distinguishable, and thus not persuasive, because the consultant went beyond the corrective-action plan to which the MPCA agreed, the liable party had already begun enacting the plan, and the environmental consultant's continued testing revealed no further contamination for the MPCA to address. *Id.* at *3.

---

[5] "Federal caselaw does not bind Minnesota courts," but when federal courts have addressed similar issues and facts, they may be persuasive. *Hinckley Square Assocs. v. Cervene*, 871 N.W.2d 426, 430 (Minn. App. 2015); *see also Hatch*, 644 N.W.2d at 830 (stating that federal caselaw interpreting MERLA is persuasive but not binding on this court).

The district court did not clearly err by determining that Landmark's work was consistent with MERLA's definition of "removal" and that Landmark's costs were reasonable and necessary because the record supports the district court's findings. Therefore, the district court did not err in awarding Hogendorf damages to recover costs for Landmark's work under section 115B.04, subdivision 1(2).

**B.      The district court did not err in awarding diminution-of-value damages under Minn. Stat. § 115B.05, subd. 1, or by relying on Hogendorf's expert and his appraisal.**

In addition to the damages under section 115B.04, the district court awarded Hogendorf damages under section 115B.05, subdivision 1, which allows an individual to recover "all damages for actual economic loss" after the release of a hazardous substance. Specifically, an individual may recover damages for "(i) any injury to, destruction of, or loss of any real or personal property . . . ; (ii) any loss of use of real or personal property; [and] (iii) any loss of past or future income or profits resulting from injury to, destruction of, or loss of real or personal property." Minn. Stat. § 115B.05, subd. 1(1). To calculate Hogendorf's damages under this section, the district court determined the diminished value of Hogendorf's property because of the contamination caused by appellants' release of hazardous substances. And the district court calculated the diminished value by relying on Hogendorf's expert. Appellants argue that both decisions were erroneous.

**1.      The district court did not err by calculating damages under section 115B.05, subdivision 1, using diminution of value.**

Appellants argue that MERLA does not contemplate diminution-of-value damages because they are speculative, conjectural, and remote, and therefore, they cannot be

27

considered "actual economic loss" under the statute. They also argue that, because Hogendorf does not intend to sell her property, there is no loss. Hogendorf argues that diminution of value is the standard process used to measure property damages and may be awarded regardless of a person's intent to sell their property.

Appellants' argument requires us to interpret MERLA. Because we provide the rules for statutory interpretation in section I above, we do not repeat them here. This section of MERLA allows recovery for "actual economic loss," Minn. Stat. § 115B.05, subd. 1(1), but MERLA does not define this phrase. Turning to dictionary definitions to determine a term's plain meaning, *see Wayzata Nissan, LLC*, 875 N.W.2d at 286, we determine that the definitions provided in *Black's Law Dictionary* convey the plain meaning of the phrase. "Actual" means "existing in fact; real." *Black's*, *supra*, at 44. "Actual loss" means "[a] loss resulting from the real and substantial destruction of insured property." *Id.* at 1129. "Loss" means "the disappearance or diminution of value," and the entry explains that, "[w]hen the loss is a decrease in value, the usual method of calculating the loss is to ascertain the amount by which a thing's original cost exceeds its later selling price." *Id.* "Economic loss" refers to "a type of damages recoverable in a lawsuit." *Id.* at 647.

We determine that the phrase "actual economic loss" is not ambiguous under MERLA and that each word is necessary—none is superfluous.[6] By synthesizing the

---

[6] During oral argument, counsel argued that not all words in this phrase are necessary and that one or more are superfluous. We note that this is contrary to our caselaw directing how we interpret statutes, and therefore, we reject this assertion. *See Sterry v. Minn. Dep't*

definitions from *Black's Law Dictionary*, we conclude that "actual economic loss" means the monetary damages that may be recovered from the real and substantial destruction or diminution of value of property. Diminution-of-value damages are consistent with the plain meaning of "actual economic loss" because they account for the loss in value of the property by considering the original value of the property and its later prospective selling price.

This determination is supported by caselaw. First, diminution of value is the most common way to measure damages for injury to real property or the interference with a property right. *See Snyder v. City of Minneapolis*, 422 N.W.2d 747, 753 (Minn. App. 1988) ("[T]he measure of damages for tortious injury to property is the diminution in value resulting from the wrongful act and damages proximately flowing from the tort."); *see also Beer v. Minn. Power & Light Co.*, 400 N.W.2d 732, 735 (Minn. 1987) (explaining that the interference with a property right is "measured by the diminution in the market value of the property," which "is the difference between the market value of the property before and after" the interference with the right (quotation omitted)).

Because diminution-of-value damages are the common remedy for tortious injury to property, awarding these damages is consistent with the supreme court's explanation that MERLA updated "the old statutory and common law liabilities" and did not change the liability or the remedies available. *Minn. Mining & Mfg. Co.*, 457 N.W.2d at 183. In

---

*of Corrs.*, 8 N.W.3d 224, 233 (Minn. 2024) ("[U]nder the canon against surplusage, we avoid statutory interpretations that make words or phrases superfluous, void, or insignificant.").

*Minnesota Mining & Manufacturing*, insurance companies argued that their insurance policies should not be interpreted to require them to pay for cleanup of the contaminated property owned by the liable party (the insured) under MERLA. *Id.* at 178. The supreme court explained that damages of this nature are not new and therefore should have been contemplated by the insurance companies when drafting their policies, even before the passage of MERLA, because they have been consistently recognized under common law: "Under the common law, damages [to real property] are typically limited to the diminution in the value of the damaged property if the cost of restoring the property to its original condition would exceed that value." *Id.* at 183. In its opinion, the supreme court identified the two types of damages that are recognized under common law for injuries to real property: diminution-of-value damages and damages equal to the cost of restoring the property to its original condition. *Id.* The supreme court's statement in *Minnesota Mining & Manufacturing* explained that, under the common law, the liable party would pay the lower of the two values. *Id.* However, the plain language of MERLA demonstrates that it removed the alternative offered by the common law and provided that an injured party may recover both types of damages: cleanup costs, under Minn. Stat. § 115B.04, subd. 1, and diminution-of-value damages, under Minn. Stat. § 115B.05, subd. 1.

Because diminution-of-value damages are consistent with the plain meaning of "actual economic loss" and have long been recognized under common law as a way to calculate damages for injuries to real property, we hold that a party may be awarded damages for the diminution of their property's value under Minn. Stat. § 115B.05, subd. 1(1).

**2.** **The district court did not err by considering the stigma of contamination and relying on Hogendorf's expert and appraisal.**

Appellants argue that the district court's findings of fact in support of its damages award were clearly erroneous because it relied on Hogendorf's expert and the expert's appraisal. As to the expert, appellants argue that the district court should not have determined that their expert was less credible than Hogendorf's because Hogendorf's expert considered the stigma of contamination, among other things.[7] As to the damages awarded, appellants argue that the district court improperly considered the stigma of contamination when evaluating the property's value because the property had been cleaned up and therefore the award of diminution of value was a double recovery. Hogendorf contends that the district court's determination that her expert was more credible is supported by the record because appellants' expert acted as an advocate rather than a neutral and her expert acted consistently with expert standards; she further contends that the diminution-of-value damages were not double recovery.

Appellate courts defer to the fact-finder's determination of the weight and credibility of expert-witness opinions. *State ex rel. Trimble v. Hedman*, 192 N.W.2d 432, 440 (Minn. 1971). Because we defer to those determinations as to each expert, we do not conclude that the district court erred in relying on Hogendorf's expert and appraisal.

---

[7] Appellants also make a general assertion that Hogendorf's expert lacked foundational reliability, but they do not provide any legal authority to support this assertion, and therefore, it is forfeited. *See Scheffler v. City of Anoka*, 890 N.W.2d 437, 451 (Minn. App. 2017) (explaining that arguments made without supporting authority need not be considered), *rev. denied* (Minn. Apr. 26, 2017). Because the argument is forfeited, we do not address it.

Turning to the appraisal's use of stigma to calculate the diminished value of Hogendorf's property, we determine that the district court did not err by considering stigma. The supreme court has considered damages related to a condemned property and explained stigma and the difference between clean, remediated, and contaminated property:

> Clean property is property that has never been contaminated. Remediated property is property that was contaminated but went through a remediation process to remove the contamination. Though the contamination is removed, the stigma of the former contamination may remain. . . . Even if the contamination is cleaned up and a property is believed to have been fully remediated, fear of discovering further contamination and the accompanying liability may reduce the property's value. The effect of stigma demonstrates how remediated property, which is no longer contaminated, is different from property that has never been contaminated.

*Moorhead Econ. Dev. Auth. v. Anda*, 789 N.W.2d 860, 883 (Minn. 2010). In an earlier opinion, the supreme court explained that stigma due to past contamination presents "the perception of risk of liability, or government imposed restrictions on the use or transferability of the property, among other concerns." *Dealers Mfg., Co. v. County of Anoka*, 615 N.W.2d 76, 79 (Minn. 2000). Although neither of these opinions involved MERLA, they demonstrate that, in caselaw, stigma is a consideration for appraisers to use and district courts to rely on when determining property value. Therefore, we conclude that the district court did not err by considering the impact of stigma on Hogendorf's property when determining the diminution of value to award damages under section 115B.05, subdivision 1.

As for whether the district court's award of both diminution-of-value damages and removal damages constitutes double recovery, the law and record demonstrate that it was not. First, MERLA allows the injured party to receive both damages awards. *See* Minn. Stat. §§ 115B.04, subd. 1(2) (removal costs), .05, subd. 1(1) (actual economic loss). And second, a federal district court opinion that appellants urge us to follow demonstrates that the district court's damages award here is consistent with the statute. In *Gopher Oil Co. v. Union Oil Co. of California*, the federal district court considered the issue of double recovery under MERLA after the injured party requested that it keep the property and recover damages equal to the cleanup costs and the entire purchase price of the property. 757 F. Supp. 988, 996 (D. Minn. 1990). The court explained that granting all of these requests would be double recovery or the equivalent of punitive damages, which were not contemplated by MERLA. *Id.* The injured party kept the property and recovered its cleanup costs and the portion of its purchase price that exceeded the actual value of the contaminated property, but not the entire purchase price. *Id.* The district court's order here is consistent with the outcome of *Gopher Oil Co.*: the district court awarded damages for cleanup costs and diminution of value, but from the latter, it subtracted the costs already expended on the cleanup that would not be transferred to a future owner of the property, and therefore not borne by Hogendorf in the future sale of her property, preventing Hogendorf from receiving double recovery.

Because caselaw demonstrates that consideration of stigma is permitted and relevant when determining a property's value after contamination and the statute and record

demonstrate that the district court did not grant Hogendorf double recovery, the district court did not err in its damages award issued under Minn. Stat. § 115B.05, subd. 1.

## DECISION

The state's involvement in investigation or cleanup of a hazardous substance after a release does not preclude the affected property owner from bringing a MERLA claim. And the term "residue," as it appears in the definition of "release" under MERLA, Minn. Stat. § 115B.02, subd. 15(b)(4), does not include "rinsate" as defined in the pesticide-control chapter, Minn. Stat. § 18B.01, subd. 25. The district court did not err in determining that Green and WGL had ample control over the release of hazardous substances onto Hogendorf's property from their facility by directing rinsate created by the rinsing of pesticides from equipment and vehicles in their workshop to drain onto Hogendorf's property. Therefore, the district court did not err by determining that a release of hazardous substances occurred and that Green and WGL were responsible persons under MERLA. Because Hogendorf proved all the elements of a MERLA claim, the district court's determination that appellants were liable under MERLA was not erroneous. The district court did not clearly err in finding that Landmark's work fell under MERLA's definition of "removal" and that its work was "reasonable and necessary," and therefore, the district court correctly awarded damages under section 115B.04, subdivision 1. Additionally, because we determine that MERLA allows for diminution-of-value damages under section 115B.05, subdivision 1, the district court did not clearly err by awarding Hogendorf these damages in addition to the damages awarded under section 115B.04, subdivision 1, or by considering the impact of stigma when awarding damages under

34

section 115B.05, subdivision 1. Accordingly, we affirm the district court's order for judgment in its entirety.

**Affirmed.**